UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JIMMIE BAUGH,

Plaintiff,

v.

JoANN MILLER,

Defendant.

Case No. 24-cv-11177
Hon. Matthew F. Leitman

_______________________________________/

**ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON LONE FEDERAL CLAIM UNDER 42 U.S.C. § 1983 (ECF No. 51); (2) DISMISSING STATE-LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BASED UPON PLAINTIFF'S DECISION TO ABANDON THE CLAIM; AND (3) DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER LONE REMAINING STATE-LAW CLAIM FOR MALICIOUS PROSECUTION**

In 2003, a jury in the Wayne County Circuit Court convicted Plaintiff Jimmie Baugh of murdering Craig Landyczkowski (who was known as "Land"). The centerpiece of the prosecution's case was testimony by Robert Kwasniewski. Kwasniewski told the jury that he was present at the time of Land's murder and that Baugh committed the killing.

In this civil action, Baugh alleges that Defendant JoAnn Miller, the lead Detroit Police Department investigator on the Land case, had possession of, and failed to disclose, an exculpatory statement by another witness to Land's murder, Ricky Sailes (the "Sailes Statement"). In the Sailes Statement, Sailes reported that

Kwasniewski, not Baugh, shot and killed Land. Baugh claims that Miller's failure to disclose the exculpatory Sailes Statement resulted in the violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Baugh also bring state-law claims for malicious prosecution and intentional infliction of emotional distress against Miller.

Now before the Court is Miller's motion for summary judgment. (*See* Mot., ECF No. 51.) Miller argues that she is entitled to judgment as a matter of law on Baugh's federal *Brady* claim on the basis of qualified immunity. The Court agrees. The undisputed evidence establishes that Miller summarized for prosecutors the key exculpatory components of the Sailes Statement, and she reasonably could have concluded that that disclosure satisfied her obligations under *Brady*. She is therefore entitled to qualified immunity on Baugh's *Brady* claim, and the Court **GRANTS** her motion for summary judgment on that claim on that basis. In addition, because Baugh has abandoned his intentional infliction of emotional distress claim, the Court **DISMISSES** that claim **WITH PREJUDICE**. Finally, the Court declines to exercise supplemental jurisdiction over, and **DISMISSES WITHOUT PREJUDICE**, Baugh's malicious prosecution claim.

# I

## A

In an earlier appeal in Baugh's federal habeas corpus proceedings, the United States Court of Appeals for the Sixth Circuit described the facts underlying the murder of Land and the initial witness interviews conducted in its aftermath as follows:

> On December 3, 2001, Land left his Detroit home to buy beer. After Land purchased beer from a convenience store, he began riding his bike toward the intersection of Hayes and Novara Streets. A stolen Jeep veered in front of Land. The person in the front passenger seat exited the vehicle and told Land to hand over his money. When Land did not immediately comply, the thief shot Land in the leg with a .22 caliber bullet. Land fell to the ground and threw $29 in the direction of the shooter. At this time, another vehicle started driving toward Land and the Jeep. The driver of the Jeep panicked and pressured the shooter to get back in the vehicle. The shooter fired one more bullet at Land, which struck his aorta. The shooter got back in the Jeep, which sped from the scene. Land died a few minutes later.
>
> The next day, law enforcement arrested Robert Kwasniewski, Jimmy Baugh, Ricky Sailes, and Lafayette Dearing for an unrelated carjacking. Police found a .22 caliber shell casing in Kwasniewski's pocket. While they were detained, Kwasniewski and Baugh both made statements to Detective JoAnn Miller of the Detroit Police Department regarding Land's murder. According to Kwasniewski, Kwasniewski stole the Jeep and picked up Baugh, who 'was a hundred dollars short on his rent and needed to hit a lick.' After finding a target, Kwasniewski stopped the Jeep, Baugh jumped out from the passenger seat, and robbed that person with a handgun. After this first robbery, Kwasniewski alleged Baugh spotted Land as

a potential target and told Kwasniewski to follow him to 'see what [he] got.' After following Land for a bit, Baugh allegedly told Kwasniewski to hit Land with the Jeep. Instead, Kwasniewski 'pulled in front of him, sort of blocking him in.' According to Kwasniewski's statement, Baugh then 'rolled down the window' and directed Land to hand over his money. When Land hesitated, Baugh shot Land. Land 'fell and threw his money' toward the Jeep. Baugh exited the Jeep 'to get the money' and he 'let off another shot.' A white van appeared, so Baugh 'jumped in the Jeep and mashed off.' As they escaped, Baugh fired two shots at the van. In sum, Kwasniewski's statement to the police indicated he was the driver and that Baugh first shot Land from inside the Jeep and fired the second, fatal shot, from outside the Jeep.

Baugh's account of the murder was markedly different. According to Baugh, Kwasniewski and Lafayette Dearing, an accomplice in the December 4 carjacking, stole the Jeep. Dearing was the driver, Kwasniewski was in the front passenger seat, and Baugh was in the back seat. They 'stopped at [a] gas station on Seven Mile [Road] and Hayes [Street].' Kwasniewski went into the gas station and noticed that Land 'got some loot on him.' Against Baugh's protest, Kwasniewski and Dearing agreed to rob Land. Baugh recalled Land walking from the gas station, not riding a bike. As Dearing drove the Jeep toward Land, Kwasniewski rolled down the passenger window to initiate the robbery. Dearing cut off Land with the Jeep. Kwasniewski exited the vehicle from the front passenger seat and attacked him. Land 'swung the bag he was carrying at [Kwasniewski].' 'That's when [Kwasniewski] shot him.' Land 'fell, [Kwasniewski] got back in the truck[,] and [Dearing] drove off.' Dearing spotted a van or truck following them, but he evaded it. In essence, Baugh's account indicated Dearing was the driver, Kwasniewski was the shooter, and Baugh was a backseat passenger who wanted no involvement in the robbery.

*Baugh v. Nagy*, No. 21-1844, 2022 WL 4589117, at *1-2 (6th Cir. Sept. 30, 2022) (internal citations omitted).

On March 16, 2002, a few months after Land's murder, Miller interviewed Sailes and took his statement. (*See* Sailes Statement, ECF No. 51-6.) As noted above, in the Sailes Statement, Sailes claimed that Kwasniewski (who Sailes referred to as "Scotti Trent") admitted that he [Kwasniewski], rather than Baugh, had shot and killed Land. (*See id.*) In its entirety, the Sailes Statement – which was handwritten by Miller and signed by Sailes – provided as follows:



DETROIT POLICE DEPARTMENT

WITNESS STATEMENT
CASE PROGRESS

FILE/CASE NO.
PRECINCT/SECTION
COMPLAINANT

DATE: 03-16-02
TIME:
PLACE: 1300 BEAUBIEN
STATEMENT TAKEN BY: JOANN MILLER

WITNESS: RICKY SAILES
RACE/SEX/AGE: B-M-20
D.O.B. [redacted]
HGT.
WGT.

SOC. SEC. NO. [redacted]
RESIDENCE [redacted]
PHONE BUS. / RES. 923-1287

EMPLOYER
DEPARTMENT
BADGE NO.
SHIFT

RESIDING WITH: GERALDINE SAILES (MOTHER)
CHILDREN/SCHOOL:
RELATIVES/FRIENDS:
ADDRESS
PHONE

Q. WHAT CAN YOU TELL ME ABOUT THE SHOOTING ON NAVARA AND HAYES?
A. SCOTTI TRENT TOLD ME WHEN I WENT OVER HIS HOUSE IN THE JEEP HE HAD BRUNG ME THE NIGHT OF THE SHOOTING. THE 3RD. HE TOLD ME WE WERE GOING TO PUT THE JEEP UP BECAUSE IT WAS "HOT" AFTER WE PUT THE JEEP UP I GOT IN ANOTHER JEEP WITH HIM. HE TOLD ME HE HAD SHOT A WHITE GUY ON NAVARA AND HAYES. HE TOLD ME JIMMY WAS DRIVING AND THEY PULLED UP ON THE WHITE GUY. HE SAID HE ASK HIM FOR HIS MONEY HE SAID THE WHITE GUY DIDN'T GIVE HIM ALL OF HIS MONEY. THE WHITE GUY STARTED TO RUN AND SCOTTIE SHOT HIM. AFTER HE FELL TO THE GROUND THE WHITE GUY GAVE HIM ALL THE MONEY. THEN JIMMIE BAUGH DROVE OFF.
Q. WHAT KIND OF GUN DID SCOTTIE HAVE?
A. A .22 HE CALLED PEGGY SUE.
Q. WHAT KIND OF JEEP WAS IT SCOTTIE GAVE YOU?

DPD 103 (REV. 4-76) X Ricky Sailes CofD—72-ST(4-76)

A. A 96 CHEROKEE. THE BOX KIND. BLACK.
Q. DID SCOTTIE SAY HOW MANY TIMES HE SHOT THE MAN?
A. NO.
Q. WHO WAS WITH YOU WHEN SCOTTIE TOLD YOU THIS?
A. IT WAS ME, JIMMIE BAUGH AND LAFAYETTE DEARING.
Q. WHERE IS THE GUN NOW?
A. I DON'T KNOW. THE LAST TIME I SAW IT WAS THE NIGHT OF THE CARJACKING.
Q. DID SCOTTIE SAY WHY HE SHOT THE MAN?
A. NO.
Q. DID JIMMIE SAY ANYTHING WHILE SCOTTIE WAS TELLING YOU THIS?
A. JIMMIE SAID SCOTTIE SHOT THE GUY AND HE DROVE OFF.
X Ricky Sailes

(*Id.*)

After Miller took the Sailes Statement, she completed an "Investigator's Report" concerning her investigation into Land's killing. (*See* Investigator's Report, ECF No. 51-8.) In the Investigator's Report, Miller first offered an overview of how she believed the crime occurred:

> The investigation reveals that the complainant was riding his bike home from the store and was heading north bound on Hayes. At which time he was approached by a dark colored SUV, occuipeid [sic] by two black males. The passenger in the vehicle order [sic] the complainant to 'run your pockets!' The complainant attempted to get away. The passenger exited the vehicle and fired a single shot at the complainant, striking him. The complainant fell to the ground and threw what money he did have at the passenger. The passenger then fired one more shot at the complainant, also striking the complainant. They then fled in the SUV. A citizen, who attempted to get the license plate from the rear of the truck, followed them. The passenger reached out of the window and fired several

> shots at the vehicle that was following them. The witness then gave the responding officers a partial license plate from the SUV.

(*Id.*, PageID.912.)

Miller then summarized the Sailes Statement. (*See id.*, PageID.913.) In that summary, Miller wrote that Sailes would testify that Kwasniewski had confessed to him (Sailes) that he (Kwasniewski) killed Land:

> **WITNESS #3** RICKY SAILES B/M/20, WILL TESTIFY TO PERP #1 TELLING HIM THAT HE NEEDED TO PUT THE JEEP UP BECAUSE IT WAS "HOT" AND THAT PERP #2 AND PERP #1 HAD PULLED UP ON A WHITE GUY AND TIRED TO ROB HIM. THE COMPLAINANT TRIED TO RUN. PERP #1 STATED THAT HE SHOT THE COMPLAINANT ONE TIME AND THE COMPLAINANT FELL TO THE GROUND AND THREW WHAT MONEY HE HAD AT PERP #1. PERP #1 THEN SHOT THE COMPLAINANT AGAIN. PERP #2 WAS INSIDE THE VEHICLE AND DROVE AWAY WITH PERP#1.

(*Id.*[1]) Miller did not attach the actual Sailes Statement to the Investigator's Report. (*See id.*, PageID.911-915.)

After Miller completed the Investigator's Report, the report was provided to Assistant Wayne County Prosecutor Donna Pendergast.[2] Pendergast reviewed the report and signed it in a box that called for the signature of the reviewing attorney

---

[1] On an earlier page of the Investigator's Report, Miller identified Kwasnieski as "PERP # 1" and Baugh as "PERP # 2." (See Investigator's Report, ECF No. 51-8, PageID.912.)

[2] Miller argues that the undisputed evidence shows that she provided the prosecution team with *both* the Investigator's Report *and* the Sailes Statement itself. (*See* Mot., ECF No. 51, PageID.849.) Baugh counters that there is a factual dispute as to whether Miller provided the Sailes Statement to prosecutors. (*See* Resp., ECF No. 52, PageID.1465.) The Court need not and does not decide whether there is a factual dispute on this point. For the reasons explained above, Miller is entitled to qualified immunity even if she provided only the Investigator's Report to the prosecution team.

from the prosecutor's office. (*See id.*, PageID.912; *see also* Pendergast Dep., ECF No. 51-6, PageID.1234, 1240.)

Based upon her review of the Investigator's Report, Pendergast recommended that Kwasniewski and Baugh both be charged with first-degree felony murder and possession of a firearm during the commission of a felony. (*See id.*) Kwasniewski and Baugh were then charged with those two offenses and one more: felon in possession of a firearm. *See Baugh*, 2022 WL 4589117, at *2.

**B**

After the charges were filed against Kwasniewski and Baugh, a state court conducted a preliminary examination. At the conclusion of that proceeding, the state court bound Kwasniewski over for trial as charged, but the court dismissed the murder charge against Baugh. The Sixth Circuit explained this turn of events as follows:

> On April 24, 2002, the Thirty-Sixth District Court of Michigan conducted a preliminary examination hearing for Baugh and Kwasniewski. Because they were codefendants, the court permitted Kwasniewski's statement to be used only against Kwasniewski, and Baugh's statement to be used only against Baugh. The state called Ricky Sailes, the codefendant from the December 4, 2001, carjacking charge. The prosecutor asked Sailes if he knew Baugh or Kwasniewski, to which Sailes replied 'no.' Sailes was then dismissed. Based only on Kwasniewski's statement, the district court found probable cause to believe that Kwasniewski had committed first-degree felony murder. However, considering only Baugh's statement, the district court held

> the state's case lacked probable cause against Baugh and dismissed the first-degree felony murder charge without prejudice.

*Id.*

After the dismissal of the murder charge against Baugh, the prosecution continued its effort to hold Baugh responsible for Land's murder. To that end, "the state offered Kwasniewski a plea agreement in which the state would dismiss Kwasniewski's carjacking charges in another suit and reduce his charge to second-degree murder instead of first-degree murder, leaving him subject to 18 to 40 years' imprisonment instead of the possibility of a life sentence." *Id.* This plea offer was conditioned on Kwasniewski agreeing to testify against Baugh. *See id.* Kwasniewski ultimately accepted the deal. *See id.* The Sixth Circuit explained what happened next:

> On July 18, 2002, the Thirty-Sixth District Court of Michigan conducted a second preliminary examination for Baugh. Kwasniewski testified against Baugh this time, implicating Baugh as the shooter. His testimony differed from his earlier written statement in that he testified that Baugh exited the Jeep before directing Land to hand over his money. With the addition of Kwasniewski's testimony, the court found probable cause to believe Baugh had committed first-degree felony murder and bound over his case for trial.

*Id.*

Kwasniewski's testimony was the focal point of the prosecution's case at Baugh's trial. During his direct examination, Kwasniewski told the jury that on the

day in question, Baugh shot and killed Land in the course of attempting to commit an armed robbery. (*See* Trial Tr., ECF No. 10-8, PageID.758-760.) The jury convicted Baugh of Land's murder. (*See id.*, PageID.1035.) At sentencing, the trial judge suggested that "the jury elected to give a lot of weight to the credibility of Mr. Kwasniewski's testimony." (Sentencing Tr., ECF No. 10-11, PageID.1054.) The judge sentenced Baugh to life in prison.

**C**

In 2015, Baugh learned of and obtained the Sailes Statement for the first time.[3] Baugh concluded that the Sailes Statement would have had substantial exculpatory value at his trial. In Baugh's words:

> There was no physical evidence introduced at trial linking Mr. Baugh to the shooting. As a consequence, guilt or innocence turned on whether the jury believed Kwasniewski's testimony over Mr. Baugh's statement to Det. Miller indicating that Kwasniewski was the shooter. Sailes's statement to Det. Miller would have directly undercut Kwasniewski's contention that Mr. Baugh shot [Land] and provided support for Mr. Baugh's assertion that Kwasniewski was the shooter. And it would have been believable because, unlike Kwasniewski (who was testifying in exchange for leniency) and Mr. Baugh (who had a clear motivation for pointing the finger at Kwasniewski), Sailes had no incentive to be untruthful.

---

[3] It is not entirely clear how Baugh came into possession of the Sailes Statement. *See Baugh*, 2022 WL 4589117, at *7 ("The exact way in which Baugh came into possession of Sailes's statement is murky."). The Court opts out of addressing this "murkiness" because, for the purposes of the Court's analysis and ruling, it does not matter how Baugh obtained the Sailes Statement.

(Supp. Br., Case No. 19-10032, ECF No. 40, PageID.1846; internal citation omitted.)

After Baugh obtained the Sailes Statement, he attempted to determine whether the prosecution had disclosed its existence prior to trial. As part of that effort, he contacted his trial attorney, James O'Donnell, and inquired as to whether O'Donnell had received the Sailes Statement. "O'Donnell immediately responded that he no longer possessed Baugh's case file, but he did not remember any statement from Sailes. O'Donnell wrote that if he had known of Sailes's statement, he certainly would have used it to impeach Kwasniewski." *Baugh,* 2022 WL 4589117, at *4. Baugh next "submitted a Freedom of Information Act request to the Wayne County Office of the Prosecuting Attorney. His request was denied 'because [the prosecutor's office] could not locate the [trial] prosecutor's file.'" *Id.* (quoting Denial Letter).

In 2016, Baugh sought post-conviction relief in state court on the basis that the Sailes Statement was newly-discovered evidence that "undermined confidence in his guilty verdict." *Id.* The state courts denied relief. *See id.* He then filed a federal petition for a writ of habeas corpus in which he argued that he was entitled to relief on the ground that the prosecution failed to disclose the exculpatory Sailes Statement. Another Judge of this Court denied the petition, and Baugh appealed to the Sixth Circuit.

The Sixth Circuit reversed and held that Baugh was entitled to relief from his conviction on the ground that the Sailes Statement had been "suppressed … in violation of *Brady*." *Id.* at *13. The Sixth Circuit granted Baugh "a conditional writ of habeas corpus that [would] result in the vacation of his conviction and sentence unless the state of Michigan commence[d] a new trial against him within 90 days after [the court's] judgment [became] final." *Id.* at *1. The prosecution chose not to retry Baugh for Land's murder.

Notably, the Sixth Circuit did not hold that Miller was responsible for the suppression of the Sailes Statement, nor did the court suggest that Miller failed to provide the statement to the prosecution team. In fact, that court did not assign blame for the suppression to any particular state actor. Instead, it concluded only that "the state" had suppressed the statement. *Id.* at *12. Moreover, there is no indication in the Sixth Circuit's decision that the court considered any arguments related to the Investigator's Report that Miller completed and provided to prosecutors.

**D**

On May 2, 2024, Baugh filed this action. (*See* Compl., ECF No. 1.) His Complaint asserts three claims against Miller – one under federal law and two under Michigan common law.[4] In the federal claim (brought under 42 U.S.C. § 1983),

[4] Baugh originally sued additional Defendants other than Miller. (*See* Compl., ECF No. 1, PageID.2.) His claims against those other Defendants have since been

Baugh alleges that Miller committed a "'*Brady* violation' under the Fifth Amendment" by "fail[ing] to disclose the [Sailes Statement] to the prosecutor." (Compl. at ¶¶ 61-62, ECF No. 1, PageID.13.) In his first state-law claim, he alleges that Miller is liable for malicious prosecution because she "initiated [the] criminal prosecution against [him]" and "acted maliciously and/or with a wanton or reckless disregard for [Baugh's] rights, by deliberately withholding" the Sailes Statement. (*Id.* at ¶¶ 73, 75, PageID.16-17.) In the second state-law claim, Baugh asserts a claim of intentional infliction of emotional distress against Miller. (*See id.* at ¶¶ 83, ECF No. 1, PageID.18.)

On May 8, 2026, Miller filed her motion for summary judgment. (*See* Mot., ECF No. 51.) As relevant here, she seeks summary judgment on Baugh's federal claim on the basis of qualified immunity. (*See id.*) The Court held a hearing on the motion on October 7, 2026. At the hearing, Baugh confirmed that he has abandoned his claim for intentional infliction of emotional distress. The parties thereafter submitted supplemental briefs. (*See* Supp. Brs., ECF Nos. 58, 59.) The Court has reviewed those briefs and is now ready to rule on the motion.

---

dismissed. (*See* Order Granting Defendant City of Detroit's Motion to Dismiss, ECF No. 10; Plaintiff's Notice of Voluntary Dismissal, ECF No. 26.)

**II**

**A**

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326–27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

**B**

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,'

'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Id.* "To do so, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074). "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown*, 814 F.3d at 457 (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). The Court may answer these questions in any order, but "if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

With respect to the clearly established prong, the Supreme Court has explained:

> 'Clearly established' means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. *al–Kidd*, supra, at 741, 131 S.Ct. 2074 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.' *al–Kidd*, supra, at 741, 131 S.Ct. 2074. This demanding standard protects 'all but the plainly incompetent or those who knowingly violate

> the law.' *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
>
> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam ), which means it is dictated by 'controlling authority' or "a robust 'consensus of cases of persuasive authority,'" *al–Kidd*, supra, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This requires a high 'degree of specificity.' *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015) (per curiam ). We have repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.' *Plumhoff*, supra, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.' *Anderson*, supra, at 641, 107 S.Ct. 3034.

*D.C. v. Wesby*, 583 U.S. 48, 63-64 (2018). "In short, officers receive qualified immunity unless they could have read the relevant precedent beforehand and

know[n] that it proscribed *their specific conduct*." *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (cleaned up) (emphasis added).

**III**

Miller argues that she is entitled to qualified immunity on Baugh's *Brady* claim because Baugh has failed to show that she violated his clearly established rights under *Brady*. (*See* Mot., ECF No.51, PageID.848.) The Court agrees. As explained below, Baugh has identified a clearly-established legal rule – *i.e.*, that law enforcement officers have a duty under *Brady* to inform prosecuting attorneys about exculpatory information – but he has failed to show that every reasonable officer in Miller's position would have understood that her "specific conduct" violated that rule. *Zorn*, 607 U.S. at 572. Miller is therefore entitled to qualified immunity.

**A**

Baugh argues that Miller violated his clearly-established right to due process when she failed to provide the Sailes Statement to the prosecution team. The right invoked by Baugh emanates from *Brady*. "*Brady* held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (quoting *Brady*, 373 U.S. at 87). *Brady* imposes upon "[t]he prosecution" an "affirmative duty to disclose evidence favorable to a defendant." *Id.* "[T]his duty

falls squarely on the prosecutor, not the police." *Moldowan v. City of Warren,* 578 F.3d 351, 377 (6th Cir. 2009).

But that "does not imply that the police have no role to play in ensuring that the state complies with its obligations under *Brady,* or that the police cannot commit a constitutional violation analogous to the deprivation recognized in *Brady*." *Id.* On the contrary, as Baugh correctly argues, "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police." *Id.* at 381. More specifically, "the police also have a '*Brady*-derived' duty to disclose material exculpatory evidence to the prosecution." *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 582 (6th Cir. 2025) (quoting *Moldowan,* 578 F.3d at 381-82).

This duty is "different" from the obligation that *Brady* imposes upon prosecutors to disclose such evidence to the defense. *Moldowan*, 578 F.3d at 380. Indeed, the purpose of requiring officers to inform prosecutors about exculpatory information is to enable prosecutors to discharge *their separate Brady* obligation to share favorable evidence with defense counsel. As the Sixth Circuit has explained, "[b]ecause prosecutors rely so heavily on the police and other law enforcement authorities, the obligations imposed under *Brady* would be largely ineffective if those other members of the prosecution team had no responsibility to inform the prosecutor about evidence that undermined the state's preferred theory of the crime. As a practical matter then, *Brady*'s ultimate concern for ensuring that criminal

defendants receive a 'fundamentally fair' trial … demands that *Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers." *Id.* at 378.

**B**

Baugh has failed to show that Miller's "specific conduct" – summarizing the Sailes Statement for the prosecution team in the Investigator's Report rather than delivering the statement itself to prosecutors – violated his clearly established due process rights under *Brady*. *Zorn*, 607 U.S. at 572. "[P]olice officers fulfill their *Brady* obligations as long as they 'inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime,'" *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quoting *Moldowan*, 578 F.3d at 378), and Miller could reasonably have concluded that she did that.

In particular, Miller could fairly have determined that the Investigator's Report sufficiently informed the prosecution team that Sailes had provided evidence favorable to Baugh. As described above, in the Investigator's Report, Miller told the prosecution team that Sailes "will testify" that Kwasniewski "stated that he [Kwasniewski]," not Baugh, "shot the complainant." (Investigator's Report, ECF No. 51-8, PageID.913.) Miller reasonably could have believed that this statement would have signaled to the prosecution team that Sailes had made a statement implicating Kwasniewski, rather than Baugh, as the shooter. Indeed, Miller could

fairly have concluded that the prosecution team would realize that she must have had (or been aware of) a statement by Sailes implicating Kwasniewski as the shooter because without such a statement, she would not have been able to say that Sailes "will testify" that Kwasniewski confessed to the shooting. Because Miller could reasonably have believed that she had sufficiently informed the prosecution team that Sailes had made a statement favorable to Baugh – and thereby enabled the prosecution team to fulfill its duty to seek, obtain, and disclose that statement, *see Kyles*, 514 U.S. at 437 – she is entitled to qualified immunity from Baugh's *Brady* claim.

**C**

Baugh counters that Miller violated his clearly-established rights under *Brady* because her summary of the Sailes Statement in the Investigator's Report failed to provide the prosecution team with key details reported by Sailes. (*See* Suppl. Br., ECF No. 59, PageID.1694, 1699-1703.) While Baugh's argument is serious one, it does not persuade the Court that Miller violated his clearly-established rights under *Brady*. The argument fails because it rests upon case law that falls short for several reasons.

First, it is highly unlikely that the cases cited by Baugh rise to the level of clearly established federal law for qualified immunity purposes. Baugh relies upon a handful of older, out-of-circuit decisions and one decision from the Michigan

Supreme Court.[5] (*See id.*) Notably, only three of those decisions – a 1998 decision from the Ninth Circuit, a 1998 decision from the Second Circuit, and the decision from the Michigan Supreme Court – actually *held* that a particular summary of exculpatory evidence failed to satisfy *Brady*. *See United States v. Serv. Deli Inc.*, 151 F.3d 938, 942–44 (9th Cir. 1998); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *People v. Christian*, 987 N.W.2d 29, 34-35 (Mich. 2022). While out-of-circuit cases may clearly establish a principle when those cases form "robust consensus of cases of persuasive authority," the case law cited by Baugh fails to establish such a consensus rule with respect to whether summaries of exculpatory evidence satisfy *Brady*. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 675 (6th Cir. 2020) (holding that the plaintiff's "reference to two out of circuit cases does not provide the 'robust consensus' required for the right to be clearly established.").

Second, none of the cases cited by Baugh involve purportedly-deficient summaries of exculpatory evidence provided by law enforcement officers to prosecutors; rather, they address summaries of such evidence provided by prosecutors to defense attorneys. That difference matters because "the role that a police officer plays in carrying out the prosecution's *Brady* obligations is distinct

---

[5] Baugh cites *United States v. Serv. Deli Inc.*, 151 F.3d 938, 942–44 (9th Cir. 1998), *Jean v. Rice*, 945 F.2d 82, 86-87 (4th Cir. 1991), *United States v. Grunewald*, 987 F.2d 531, 535 (8th Cir. 1993), *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007), and *People v. Christian*, 987 N.W.2d 29, 34-35 (Mich. 2022).

from that of a prosecutor." *D'Ambrosio,* 747 F.3d at 389. As explained above, police officers must give prosecutors enough information to enable them (the prosecutors) to identify, obtain, and disclose exculpatory information to a defendant. The cases cited by Baugh address whether the prosecution satisfied *its particular disclosure* obligation by providing opaque or incomplete evidence summaries. Because the cases addressed the prosecution's distinct *Brady* obligations, they would not necessarily have given Miller clear notice of any rules applying to her conduct. For this additional reason, Baugh's cases do not clearly establish that Miller violated her obligations under *Brady*. *See Zorn*, 607 U.S. at 572 (explaining that precedent clearly establishes a rule only if an officer could have "read" it and "know[n] that it proscribed *their specific conduct*.") (emphasis added).

Third, even if the cases cited by Baugh did apply to summaries prepared by police officers for prosecuting attorneys, the cases would still fail to clearly establish that Miller's conduct was deficient. In those cases, the courts found summaries of exculpatory evidence to be insufficient where the summaries omitted key favorable portions or aspects of the evidence. *See Serv. Deli Inc*., 151 F.3d at 943-44 (9th Cir. 1998) (finding *Brady* violation where the "the foundation of the government's entire case rest[ed] upon the testimony of one key witness," and where the government's summary of that witness's prior statements omitted "three key pieces of information" that could have substantially undermined the witness's trial testimony);

*Christian*, 987 N.W.2d at 45 (finding *Brady* violation where summary of prior statements by witness whose "testimony was central to the prosecution's case" differed from actual statements "in eight important ways" that, if made known to the jury, "would have significantly undermined" the witness's testimony). In contrast to the prosecution's summaries in those cases, Miller's summary of the Sailes Statement directly identified the core exculpatory value of that statement: namely, Sailes's contention that Kwasniewski confessed to killing Land. That was the precise feature of the Sailes Statement that the Sixth Circuit identified as having substantial exculpatory value in its decision granting habeas relief to Baugh based upon the *Brady* violation. *See Baugh*, 2022 WL 4589117, at *11. While Miller did omit from her summary of the Sailes Statement other details provided by Sailes in that statement, the omitted details were not nearly as important as Sailes's report that Kwasniewski had confessed to killing Land.[6] In short, Miller's summary of the Sailes Statement was meaningfully different than the summaries of exculpatory evidence deemed deficient in the cases cited by Baugh, and those cases thus would not clearly have put Miller on notice that her summary in the Investigator's Report did not fulfill her *Brady*-derived obligations. Baugh's reliance on those cases is therefore insufficient to overcome Miller's qualified immunity defense.

[6] For example, the Investigator's Report did not include the fact that Kwasniewski stated that the murder weapon was a .22-caliber gun nicknamed Peggy Sue. (*See* Suppl. Br., ECF No. 59, PageID.1695.)

For all of these reasons, the Court **GRANTS** Miller's motion for summary judgment to the extent that it seeks summary judgment on Baugh's *Brady* claim.[7]

## VI

Because Miller is entitled to summary judgment on Baugh's one federal claim, the Court declines to continue to exercise supplemental jurisdiction over Baugh's lone remaining state-law claim for malicious prosecution.[8] *See Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."). Declining supplemental jurisdiction is especially appropriate here since Baugh's malicious prosecution claim involves complicated questions of probable cause better addressed in state court. Baugh's state-law malicious prosecution claim is therefore **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: November 19, 2026

---

[7] Miller argues that summary judgment is merited on several other grounds. Because the Court has found that Miller is entitled to qualified immunity, it will not reach the other grounds presented by Miller.

[8] As noted above, at the hearing on the motion for summary judgment, Baugh clarified and confirmed that he has abandoned his intentional infliction of emotional distress claim (Count III of the Complaint). In light of that clarification, the Court **DISMISSES** that claim **WITH PREJUDICE**.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 19, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126